WILLIAM WEISS AND GLORIA WEISS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weiss v. Commissioner
Docket No. 7664-84.
United States Tax Court
T.C. Memo 1987-505; 1987 Tax Ct. Memo LEXIS 501; 54 T.C.M. (CCH) 769; T.C.M. (RIA) 87505; September 29, 1987. Kenneth Zuckerbrot *502 and Robert S. Blaustein, for the petitioners. John M. Elias and Ralph Eppensteiner, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in income tax for the taxable years 1976 through 1980 as follows: Year
Deficiency
1976
$ 26,475.39
1977
29,163.63
1978
28,351.00
1979
36,692.00
1980
42,316.42
By amended answer respondent also seeks additions to tax for all years in dispute on the ground that a portion of the deficiencies in each year constitutes a substantial underpayment attributable to a tax motivated transaction under section 6621(c). [1]
The issues are: (1) Whether and to what extent petitioners are entitled to deductions *503 and credits from a railroad boxcar leasing investment; [2] and (2) whether petitioners are liable for increased interest under section 6621(c) on a substantial underpayment arising from participation in a tax-motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, husband and wife, resided in Chappaqua, N.Y., when they filed their petition. On their joint Federal income tax returns for 1976 through 1980 petitioners reported Schedule C losses and investment tax credits, allowed by respondent as shown below: Loss
Loss
ITC
ITC
Year
Reported
Allowed
Reported
Allowed
1976
$ 56,219.02
-0-
$  3,311.00
$    62.50
1977
74,387.81
-0-
* 504.31
419.52
1978
79,847.00
-0-
* 31,420.00
-0- 1979
76,364.00
-0-
2,607.00
606.00
1980
44,155.00
-0-
13,900.00
1,435.00
*504 Except for the ITC in 1979 and 1980, [3] the amounts disallowed were generated by an equipment leasing arrangement involving railroad boxcars. More particularly, the losses reported are broken down as follows: Gross Rental
Interest
Year
Income
Mgt. Fee
Repairs
Expense
1976
$  68,832.79     $  8,259.93
$ 15,091.00     28,317.33
[$ 1,720.82/car]
[$ 377.25/car]
1977
83,307.68     9,996.92
27,457.61     32,180.96
[$ 2,082.69/car]
[$ 686.44/car]
1978
105,318.00     12,638.00
53,396.00     31,071.00
[$ 2,633.00/car]
[$ 1,335.00/car]
1979
69,018.00     8,282.00
18,626.00     30,414.00
[$ 1,725.45/car]
[465.65/car]
1980
-0-     -0- -0-     29,478.00
*505 Deprec-
Loss
Year
iation
Reported
1976
* $ 73,383.35
56,219.02
1977
88,060.00
74,387.81
1978
88,060.00
79,847.00
1979
88,060.00
76,364.00
1980
14,676.65
44,155.00
Background of Rail Freight Car Industry
During the mid-1970's there was a significant shortage of and high demand for railroad boxcars. The average cost of a new general service boxcar was $ 18,000 in 1973, $ 22,900 in 1974, $ 31,168 in 1975, and $ 30,923 in 1976. [4]
The Official Railway Equipment Register ("RER") is a railroad industry publication which identifies by railroad the rolling stock on its lines and the car hire rates for such rolling stock. When Harvey J. Polly ("Polly") and petitioner [5] entered into the transactions described below, the Interstate Commerce Commission ("ICC") regulated car hire rates for boxcars. During the mid-70's these rates were frequently increased by the ICC. *506 The ICC car hire rates included a daily charge by which railroads compensated each other for the use of one another's equipment ("per diem"), a mileage charge, and an incentive per diem rate ("incentive income"), which was an additional amount occasionally permitted by the ICC at times of boxcar shortages to encourage greater use of the cars. Per diem rates were based on the cost or "ledger value" (used interchangeably) and age of a car, according to a standard car hire table. The table was broken into six 5-year periods (up to 30 years) and cost brackets in $ 2,000 increments. Thus, the newer and costlier cars brought the highest per diem. The mileage rates, on the other hand, were based solely on the cost bracket of the car, without regard to its age, except that cars over 30 years old drew a lower flat rate, regardless of cost bracket. The AAR rules provided that if a car were "rebuilt" pursuant to ICC and AAR guidelines it was treated as "new" for purposes of determining its age category in calculating car *507 hire rates. A car's ledger value was its original cost to its original owner. Effective February 1, 1976 a special AAR rule, OT-37B, allowed a railroad one time only to rehabilitate a car and capitalize the cost. This would throw the car into a higher per diem bracket, allowing the railroad to more quickly recover the cost of rehabilitation. Rule OT-37B was designed to encourage railroads to upgrade equipment and alleviate the boxcar shortage. The rehabilitation expenditures were added to the ledger value listed by the original owner, even though a "secondhand" owner may have paid less than the original value. Accordingly, a car's ledger value to a secondhand owner could exceed his actual purchase price. To illustrate: The best of all possible worlds for an investor would be to find a wrecked, one-year old car that originally cost, say $ 15,000. The investor might buy it for $ 2,000 and rehabilitate it for $ 5,000. The second-hand owner's cost is thus $ 7,000, but the car's ledger value is $ 22,000 for purposes of calculating per diem. In this manner a rehabilitated used car could -- by legislative fiat -- generate a higher rate of return than a new car. After the *508 AAR approved the OT-37B revaluation a boxcar was listed in the Uniform Machine Language Equipment Register ("UMLER") at the revised ledger value; and the AAR notified railroads of the revised value and hire rate. Unlike the per diem and mileage rates, OT-37B did not affect the "incentive" rate. Polly's Acquisition of Boxcars
In December of 1976, Harvey J. Polly through Harvey Industries, Inc. (Industries) bought 630 railroad boxcars from Chemical Bank of N.Y. (Chemical) [6] for an aggregate price of $ 4,144,500. Included in the group were 292 50-foot boxcars in the 164000 and 165000 series. They were valued, for purposes of determining purchase price, at $ 6,500 each, a price the parties believed was the fair market value based upon an appraisal performed for Chemical. Chemical had received title to the cars as a result of Penn Central Railroad Company's bankruptcy. Before the sale the cars were under lease to Penn Central. [7]
*509 No cash downpayment was required. The purchase was financed by a promissory note from Industries to Chemical in the amount of $ 4,319,500. [8] As amended on December 15, 1974, the note and sale agreement provided that payments would be made quarterly from June 1, 1975 to June 1, 1985, a period of 10 years, with interest accruing at 8 percent. Payment terms were amended to require weekly deposits in two bank accounts Industries maintained at Chemical, the "rental account" and the "incentive account." Payments would consist of all rent received in the preceding quarter, less significant deductions. Polly could deduct from the note payments all "incentive income" earned, 6 percent of rent after subtracting incentive income, out of pocket maintenance and operation costs (including $ 20,000 per year salary for a maintenance supervisor), accounting fees, and the cost of insurance on Polly's life, payable to Industries in the amount *510 of $ 500,000 as required by the conditional sale contract. Polly was required to bear up to $ 175,000 of Chemical's costs relating to the sale. See n. 8. Payment on the conditional sale indebtedness was specifically limited to income and proceeds generated by the railroad cars. Chemical's remedy in the event of Industries' default was limited to the railroad cars. [9]
*511 During his preliminary negotiations with Chemical, on or about May 27, 1974, Polly provided a projected pay-out schedule. The schedule was based on the purchase of 641 cars (of three types) for the total sum of $ 4,383,000. Polly's schedule showed that the note and accrued interest at 8 percent would be paid off during the eighth year. [10]
Polly based estimated income on industry standard car hire rate charts for 1974 for per diem and mileage, assumed 340 days use per year, and assumed no increases in the per diem and mileage rates over the life of the note. Polly used rates for the 164000-165000 series cars in the $ 7,001-$ 9,000 cost bracket on the charts, the ledger value alledged by Shearson Hammill & Co. and by Penn Central to be registered in UMLER. [11] (The UMLER *512 document itself is not in evidence.) Income was reduced by assumed maintenance costs of $ 150 per car [12] and a 5 percent administration fee to Polly. Polly's assumptions did not take into account any percentage of gross revenues to be retained by the lessee railroad. The final terms (discussed above) varied from those assumed in the pay-out schedule, in Polly's favor. Polly was responsible for taxes, and nominally assumed *513 the risk of damage, destruction, or loss of a unit. However, under the LOAM lease discussed below the lessee assumed responsibility for damage, destruction, or loss of cars in its possession. Thus, except for taxes, if any, Polly's risk was minimal. The parties have stipulated that as of December 15, 1974, Chemical believed it would be paid all amounts owing under the conditional sale agreement within a minimum of 10 years. The LOAM Lease
On December 31, 1974, Polly (d/b/a/ Harvey Enterprises) [13] leased the cars to the Louisiana Midland Railway ("LOAM") for 5 years. [14] LOAM agreed to pay Polly 93 percent of income received by LOAM for the use of the cars by others, and 93 percent of ICC car hire rates when LOAM used the cars itself. [15] Rental payments were not fixed but depended on actual use. Incentive income would be segregated into a special joint account maintained by LOAM and Enterprises for the purchase of new cars or rehabilitation of old cars. Any cars acquired from LOAM's 7 percent share of the incentive account would be LOAM's property. Cars acquired from Polly's share would belong to Enterprises but, as Polly's option, could be leased to LOAM. [16]
*514 Polly would bear the cost of ordinary maintenance and repair of the cars and of correcting structural defects. However, Industries, another of Polly's alter-egos, was entitled to retain, under its agreement with Chemical, an amount equal to all out-of-pocket expenses for repairs and maintenance. The net effect is that Polly incurred no costs for maintenance and repairs of these boxcars. LOAM was responsible for damage, destruction, or loss when the cars were in LOAM's possession. Polly was required to keep the cars insured against fire and other customary risks and to pay taxes, if any. Rental payment would cease as to any cars removed from service. When Polly bought the cars they were under lease to Penn Central, who agreed to put the cars in "interchange condition" [17] at Penn Central's cost and to re-stencil them on behalf of LOAM with LOAM's marks as Penn Central's leases expired. LOAM was to begin receiving the cars in early 1975. At that time boxcars were in very high demand. Cars rarely came "home" to he railroad that owned or leased them, because another railroad would *515 reload them and send them in different directions. During the first half of 1975, most of Polly's cars were operating, but Penn Central received and kept most of the revenue because the cars did not bear LOAM's markings. Penn Central re-marked most of the cars during the late winter and early spring of 1975, and they began to generate revenue for Polly. However, to Polly's and LOAM's surprise, when the cars started coming home to LOAM in late spring of 1975, many of them were "bad ordered," i.e., in need of repairs to comply with the AAR's safety standards. They were not in interchange condition as had been promised. The 1976 Rehabilitation
The cars at issue were originally built in 1949 and were 40 feet 6 inches long. They were rebuilt and extended to 50 feet 7 inches in 1969. The cars were defective because bolsters had not been properly tied to the sidesill of the cars when they were stretched. On November 10, 1975, LOAM wrote Polly recommending that all the cars be overhauled to correct the design deficiencies. In addition, some cars required work such as replacing the lining, replacing stringers, and miscellaneous body and roof work. Based on estimates by four *516 repair shops that had inspected the cars, LOAM thought Polly would have to spend about $ 5,000 per car for rehabilitation. LOAM estimated the overhaul would enable the cars to be used an additional 5 to 10 years. On January 29, 1976, Jena Freight Car Service, Inc. ("Jena"), another Polly-owned company, agreed to rehabilitate the cars for $ 3,860 each. Polly advised Chemical of the need for repairs. When the problem was discovered, Polly had collected about $ 750,000 in boxcar rent scheduled to be turned over to Chemical. Polly asked Chemical to let him reinvest the funds to repair the equipment, in order to (1) keep the cars running and thereby insure repayment of Chemical's note; and (2) to put the cars in a higher per diem bracket, allowing Polly to recapture the cost. Chemical authorized the repairs. The bank waived default, deferring payment of principal and interest until December 31, 1976, except for 2 percent interest. Seventy-one cars, including the 40 cars purchased by petitioner [18] were rehabilitated at $ 3,860 [19] each and placed in service between January 23, 1976, and February 23, 1976. The work was completed within 2 to 3 weeks before the cars were placed in *517 service. Following their rehabilitation Industries assigned the cars a new "ledger value." Petitioner claims this value was $ 15,001-$ 17,000. [20] There is no evidence that this ledger value was registered in UMLER or that the revaluation under OT-37B was accepted by the AAR in this amount. We note that the ledger value purportedly claimed by Penn Central ($ 7,001-$ 9,000) plus the rehabilitation costs ($ 3,860) equals $ 10,861 to $ 12,860, which, at best, would put the cars in the $ 11,001 -- $ 13,000 bracket, not $ 15,001 to $ 17,000 bracket. We find that OT-37B applied to put the cars into the $ 11,001 -- $ 13,000 cost bracket. *518 The RER car hire table effective May 1, 1975, shows the following rates: Mileage
Per Diem (Dollars)
Cost Bracket
(cents)
6-10 yrs.
11-15 yrs.
16-20 yrs.
$  7,001- 9,000
2.62
3.07
2.76
2.45
11,001-13,000
2.89
4.08
3.61
3.15
13,001-15,000
3.03
4.58
4.04
3.50
15,001-17,000
3.17
5.08
4.47
3.85
Used, rebuilt boxcars quickly became unavailable. Because the per diem on Polly's cars was so much lower than that on a new car, his cars were in high demand and his rate of return was higher than it would have been on a new car. The Weiss Transaction
Polly had known William L. Weiss (petitioner) since the early sixties. Petitioner, a business lawyer and Harvard Law School graduate, had represented Polly in other railroad and railroad car leasing deals since 1970. Petitioner's specialty is in exercising business judgments on behalf of clients, focusing on numbers, negotiations, and business interrelationships to advise clients on whether a proposed transaction is a "good deal." Polly's usual method of operating was to negotiate his own deals, then ask petitioner to work out the documents necessary to close the transaction. *519 Petitioner did not usually review the economics of a Polly transaction, but Polly would tell petitioner why a particular deal was a good one. In this case, Polly conducted his own negotiations with Chemical. He may have drafted the LOAM lease, although it was typed in petitioner's office. Polly discussed the economic considerations of the transaction with petitioner, but apparently did not show petitioner the projections Polly had given to Chemical. [21] Petitioner was privy to and reviewed all the transaction documents that Polly had seen. Nothing was signed with Chemical that petitioner did not first approve. Impressed by Polly's explanation, petitioner asked to participate in the transaction, and Polly agreed to let him buy 40 of the cars "on the same basic terms" as Polly, if Chemical agreed. [22] Although petitioner's terms differed from Polly's (see below), and although petitioner *520 knew of Polly's initial difficulties concerning rent collection and maintenance, petitioner never performed his own economic analysis, either when Polly purchased the cars in 1974 or when petitioner entered into his own transaction in 1976. Petitioner was not concerned about possible renewal of the LOAM lease, and he considered the car hire rate tables meaningless. Because he thought new car prices were rising [23] and demand for cars was great, petitioner assumed boxcar leasing was "a forever game." Petitioner first asked to participate in late 1974 or early 1975, but his cars were not rehabilitated and ready for service until February 1976. On February 9, 1976, petitioner and Polly, on behalf of Harvey Industries, executed a conditional sale agreement and a management and pooling agreement. The Weiss-Polly deal was structured similarly to the Polly-Chemical deal, but there were some significant differences. The conditional sale contract petitioner *521 signed called for the purchase of 40 rehabilitated cars at $ 10,360 each, or an aggregate price of $ 414,400, with no cash down. This was equivalent to Polly's original cost ($ 6,500 per car) plus the rehabilitation cost. Petitioner's price was not based on any independent appraisal, nor was it negotiated. Petitioner's cars were subject to the LOAM lease, which then had approximately 4 years to run. Under the Weiss agreement, payment to Industries would be made quarterly from June 1, 1976 through June 1, 1981 (when a balloon payment of the unpaid balance was due). Each payment would consist of all rent collected in the preceding 3 months less (a) incentive income, (b) 12 percent of the rent after deducting the incentive income, and (c) any unreimbursed out-of-pocket costs incurred by petitioner for maintenance, repair, and operations. Interest on the unpaid debt accrued at 8 percent. Industries retained a security interest in the box cars. Petitioner did not sign a promissory note. The management and pooling agreement authorized Industries to enter into operating agreements to include petitioner's cars. Industries would collect all rents due under the operating agreements, *522 arrange for normal maintenance and repair, and maintain books and records. Although the pooling agreement provided that petitioner would pay a 20 percent management fee to Industries, both petitioner and Polly's CPA testified that petitioner was actually charged only 12 percent, the amount he deducted on his income tax returns for the years in issue. We find that petitioner was actually charged 12 percent, notwithstanding the written agreement. [24] After these deductions the remaining rents would then be distributed to all pool members pro rata. [25]
While many of the terms are the same, the differences in the Polly-Chemical deal and Petitioner's arrangement are summarized below: Polly (12/74)
Pet. (2/76)
Price per car
$ 6,500
$ 10,360
Condition of cars
Believed to be
Rehabilitated,
in "interchange
in interchange
condition"
condition
Cost bracket
$ 7,001-$ 9,000
$ 11,001-$ 13,000
Length of loan term
10 yrs.
5 yrs.
with balloon payment
(due 6/1/85)
(due 6/1/81)
Remaining term of
LOAM lease
5 yrs.
4 yrs.
Mgmt. fees
- Pd. to others
7% (to LOAM)
12% (to Polly) [26]
(later reduced to 6%)
- Pd. to self
6%
0
Actual age of cars
(built 1949)
25 yrs.
27 yrs.
Rebuilt age (1969)
5 yrs.
7 yrs.
Security for loan
boxcars
boxcars
Polly's stock in Industries
(backed by $ 500,000 ins. on
principal's life)
Promissory note
yes
no
Other:
Third party financing
Seller-financing
with financial
institution
*523 Petitioner's investment provided substantial tax benefits. For 1976, petitioner reported income from wages, interest, partnerships, capital gain, and fees totaling $ 91,241. Yet except for self-employment tax of $ 122.92, petitioner showed a tax liability of zero. A similar pattern prevailed for 1977, 1978, and 1979. Petitioner reported a tax liability for the first time in 1980 -- and that in the amount of $ 4,164 alternative minimum tax. The Consumer Price Indices ("CPI") for the period 1973-1981 show *524 inflation at the following rates: Year
Annual Change
1973
6.2%
1974
11.0%
1975
9.1%
1976
5.8%
ULTIMATE FINDINGS OF FACT 1. In 1976 the cars were 7 years old for purposes of the car hire rates, but their real age was 27 years. 2. After rehabilitation OT-37B applied to increase the cost bracket of the cars from $ 7,001-$ 9,000 to $ 11,001-$ 13.000. 3. Salvage value of the cars would be $ 3,000 each or $ 120,000 total at the end of 1979. 4. The 1976 overhaul extended the useful life of the cars an additional 8 years, at the end of which the cars would be 35 years old and salvage value would be negligible. OPINION Respondent sets forth 4 theories for denying the losses and ITC claimed by petitioner: 1. Petitioner is not the tax "owner" of the boxcars, because he does not bear the benefits and burdens of ownership, i.e., the risk of loss or possibility of gain; 2. The transaction lacks economic substance and must be disregarded for tax purposes; 3. Petitioner did not enter the transaction for the purpose of making a profit, and his deductions must therefore be limited by the amount of his income; and 4. The conditional sale indebtedness *525 is too contingent to be given effect; therefore, it cannot be used to determine basis for depreciation or ITC nor should interest payment deductions be allowed thereon. Respondent also contends that petitioner is liable for additional interest under section 6621(c). Petitioner contends the opposite. Petitioner has the burden of showing that respondent's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent bears the burden of proof with respect to the issue of increased interest first raised in his amended answer. Rule 142(a). Tax Ownership
We agree with respondent that petitioner had neither a risk of loss nor a reasonable hope of gain. He invested no cash down; all payments on the note, including interest, were due only out of income; management fees were similarly paid only from income; petitioner's out-of-pocket costs were reimbursed from income (and would probably not have been incurred absent income); and, if the note was not paid off when due in 5 years, the seller's only recourse was to take back the cars. *526 Further, not a single economic analysis of the transaction (see below), including that of petitioner's own expert, shows a possibility that the debt could have been paid off by June 1, 1981 as the conditional sale contract required. Petitioner's most optimistic schedule shows a balloon balance of $ 102,028 at the end of 1981. However, the "salvage value" he himself claimed on his return was only $ 62,160 in early 1980. The more realistic schedule which we adopt below shows a balloon of $ 222,777 versus salvage value of less than $ 120,000. These facts indicate petitioner did not acquire any equity ownership. We also note that petitioner was not entitled to retain one cent of income until the note was fully paid, which in our view would have taken more than 9 years under the most favorable projections which could have reasonably been expected. (See discussion below.) However, we prefer not to base our decision in this case on a "tax ownership" theory. Most of the cases in this area -- and the cases cited by the parties -- have generally involved sale-leaseback arrangements, where a lease was recharacterized as a sale or vice versa, or a sale was recharacterized as a financing *527 arrangement. See, e.g., Frank Lyon Co. v. United States,435 U.S. 561 (1978); Swift Dodge v. Commissioner,692 F.2d 651 (9th Cir. 1982); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). In the sale-leaseback context we are able to point to a particular party who is the true owner. This transaction, however, is not a sale-leaseback. The lessee LOAM was never the owner of these cars. Moreover, respondent does not undertake to recharacterize this transaction as something other than a purchase, nor does respondent tell us who the "true" owner was if petitioner was not. What respondent would have us do instead is to nullify the transaction altogether. We therefore move on to examine his other theories, which we think are more appropriate in the present context. Economic Substance
A transaction will be respected for tax purposes if it has economic substance. The *528 test for economic substance is whether a reasonable possibility of profit existed apart from tax benefits. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91 (4th Cir. 1985), affg. on this issue 81 T.C. 184 (1983). The proper focus of our analysis is petitioner's transaction. We therefore do not pass judgment with regard to Polly's projections as to his own transactions. We included these in the facts only because the parties stress them and to consider the possible extent to which they may have affected petitioner's thinking. Further, even if the Chemical-Industries deal had economic substance and would have yielded Polly a profit (a question we do not decide), petitioner's arrangement varied substantially from Polly's. Petitioner's deal must stand or fall on its own merit. We have carefully considered the reports and testimony of petitioner's expert Morton I. Kalb and respondent's expert Jeffrey W. Traenkle. Kalb appeared both as a fact and an expert witness. He is a CPA who practiced accounting as an employee for accounting firms and as a partner from 1956 to 1977. He has audited companies in the railroad industry. From 1971 *529 to 1974 he was a partner in the firm that audited Emons Industry, Inc. where Polly was president and petitioner was legal counsel. Since 1977 Kalb has been employed by Polly and his entities. He has experience in projecting operations, arranging financing and leases, and day-to-day management of used and new freight cars and piggyback trailers. Kalb prepared the figures used by petitioner in the returns in issue, and he testified regarding the origin of those figures as well as to conditions in the industry during the years in issue. Jeffrey W. Traenkle testified for respondent. He is the vice president of Arthur D. Little, Inc. ("ADL") and chairman of the board of Arthur D. Little Valuation, Inc. He specializes in financial consulting and has done residual value and useful life studies for lessors of railroad cars. In the mid-1970's Traenkle was in charge of ADL's planning work for the reorganization of Penn Central. He has provided financial analysis for at least one railroad leasing transaction. In 1976 ADL developed a table showing average annual maintenance costs for freight cars. The table was based on a survey of 14 railroads and included all types of cars including *530 boxcars. The maintenance table formed the basis for Traenkle's assumptions regarding anticipated repair costs for the Polly-Weiss transaction. Each expert provided schedules with and without inflation. We do not completely accept any of the schedules suggested by the experts. We believe petitioner's expert Kalb's assumptions are flawed in using a $ 15,001-$ 17,000 ledger value which is not supported by the record. His estimated maintenance costs were unduly low. On the other hand, his assumed utilization rate of 310 days per year was close to the ADL estimate (300 days/year), and his mileage assumptions were lower than ADL's. We also disagree with some assumptions made by respondent's expert Traenkle, particularly his use of the $ 7,001-$ 9,000 ledger value and a 4-year useful life. (Traenkle testified that rehabilitation would extend the useful life 5-10 years, but he did not carry his projections beyond the expiration of the LOAM lease). We also do not agree that petitioner's management fees totalled 19 percent, although we acknowledge that the operative documents could be read to support that assumption. We think it probable that the LOAM lease was amended before 1976 *531 to provide a management fee to LOAM of 6 percent rather than 7 percent; and we accept Kalb's testimony as a fact witness that the LOAM fee was incorporated in the 12 percent petitioner paid to Polly. Furthermore, although we believe the ADL repair costs are closer to reality than those assumed by Kalb, we have reduced them by 25 percent to allow for the 1976 rehabilitation and because the ADL charts were not limited to boxcars but included all types of freight cars, some of which would likely have engendered higher repair costs. Considering the real age of petitioner's cars in 1976 (i.e., 27 years as opposed to the AAR age of 7 years), the use of ADL's figures as modified seems justified. We accept the ADL estimated mileage and salvage value. We also think it reasonable to assume an inflation rate of 8 percent, which is close to the average of the actual inflation rate experienced from 1972 to 1976. Although the inflation rate exceeds ADL's estimate of 5 percent, we are also aware that in 1976 boxcars were in high demand and that the ICC had been liberal in granting rate increases. We further assume that the 1976 overhaul extended the cars' useful economic life an additional *532 8 years. Useful life has been defined as the number of years an asset is expected to be employed in the taxpayer's business. Massey Motors v. United States,364 U.S. 92, 107 (1960). This may be less than the physical life of the asset. A determination of useful life, whether grounded in physical determination or in economic usefulness, is one of fact. Casey v. Commissioner,38 T.C. 357, 381 (1962). LOAM's director of purchasing believed the rehabilitation would enable the cars to be used for an additional 5 to 10 years. LOAM's president, Craig Burrows, testified that he had expected the overhaul to satisfy the cars' needs for 7 or 8 years, after which another rehabilitation (which could not be capitalized under OT-37B) would be required. Burrows was an objective, credible witness, with an abundance of "hands on" experience in the industry. We further accept Traenkle's estimated salvage value of $ 3,000 per car at the end of 1979, based on scrap value at 10 percent of purchase price. This assumption is highly favorable to petitioners, who, in calculating *533 depreciation, claimed a salvage value after 4 years of only $ 62,160 for the 40 cars ($ 1,569.52 per car) on their return. Considering the likely effects of inflation on repair costs and the actual depreciation in salvage value after 1979, we doubt the cars' economic useful life could reasonably be expected to extend beyond 1984, when they would be 35 years old. We therefore believe the following assumptions were most reasonable in 1976: Assumptions
Source
AAR Age of Car (1976)
7 yrs.
AAR Cir. OT-37B
Ledger Value
$11,001 - 13,000
Penn. Cen. Cost & Rehab.
Per diem rate 6-10 yrs.
$ 4.08 ICC Rates eff. 5/1/75
For 40 cars
163.20 Per diem rate 11-15 yrs.
3.61 ICC Rates eff. 5/1/75
For 40 cars
144.40 Per diem rate 16-20 yrs.
3.15 ICC Rates eff. 5/1/75
For 40 cars
126.00 Mileage rate
.0289 ICC Rates eff. 5/1/75
For 66.7 miles/day
1.93 For 40 cars
77.20 Est. Mtce. 6-10 yrs.
337.50
ADL Survey less 25%
For 40 cars
13,500
11-15 yrs.
430.50
ADL Survey less 25%
For 40 cars
17,220
16-20 yrs.
549.75
ADL Survey less 25%
For 40 cars
21,990
Utilization (days/yr.)
310 Kalb
Miles per day
66.7 ADL
Inflation rate
8%  Avg. 1973-1976; Kalb
Management fees
12%  Record; Kalb
Useful Econ. Life
8 yrs.
Record
(from 2/76)
Salvage Val. (12/3/79)
3,000 ADL
Opening loan bal.
414,000
Cond'l Sale Agt.
Interest rate
8%   Cond'l Sale Agt.
Pay Off Date (Balloon)
6/1/81 Cond'l Sale Agt.
*534 We further assume the LOAM lease, expiring 12/31/79 would be renewed on similar terms. Based upon boxcar shortages existing in 1976, such an assumption was reasonable. We have not calculated incentive pay for 3 reasons: (1) The record is devoid of any information by which we could do so. We are not told either the rates or the dates such pay was allowed before or during 1976. (2) Petitioner would receive no direct benefit from incentive rates since all such amounts went into a special LOAM/Enterprise account reserved solely for buying new cars or rehabilitating old ones. We are not told how or if the funds were actually used. (3) Petitioner's expert ignored incentive pay in his calucation of income; respondent's expert says, "The freight car incentive never applied to XL cars (the type we are concerned with here)". Since petitioner has not met his burden of establishing what, if any, incentive pay could have been anticipated, we disregard it. Based on these assumptions, our analysis of anticipated debt reduction is shown below: 6-10 Year Age Bracket
(1976)
(311 days)
1977
1978
1979
Per diem
$ 43,107
$ 54,991
$ 59,773
$ 64,971
Mileage
20,391
26,012
28,274
30,733
Total Revenue
$ 63,498
$ 81,003
$ 88,047
$ 95,704
Mgt. Fees
(12%)
8,654
9,720
10,566
11,484
Repairs
11,503
14,674
15,950
17,337
Interest
28,220
31,910
29,934
27,407
Total Expenses
$ 48,377
$ 56,304
$ 56,450
$ 56,228
Opening Debt
414,000
398,879
374,180
342,583
Principal
Deduction
15,121
24,699
31,597
39,476
Balance Debt
$ 398,879
$ 374,180
$ 342,583
$ 303,107
(LOAM Lease
ends)
*535 11-15 Year Age Bracket
1980
1981
1981
1983
1984
Per diem
$ 62,485
$ 67,918
$ 73,824
$ 80,243
$ 87,221
Mileage
33,405
36,310
39,467
42,899
46,629
Total Revenue
$ 95,890
$ 104,228
$ 113,291
$ 123,142
$ 133,850
Mgt. Fees
(12%)
11,507
12,507
13,595
14,777
16,062
Repairs
24,037
26,127
28,399
30,868
33,552
Interest
24,249
21,361
17,822
13,544
8,428
Total Expenses
$ 59,793
$ 59,995
$ 59,816
$ 59,189
$ 58,042
Opening Debt
303,107
267,010
222,777
169,302
105,349
Principal
Deduction
36,097
44,233
53,475
63,953
75,808
Balance Debt
$ 267,010
$ 222,777
169,302
$ 105,349
$ 29,541
(Balloon
(Useful Life
due 6/1/81)
ends)
The above chart shows that the conditional sales debt would not be paid off until after the end of the useful life of the cars. Neither party has offered evidence of the salvage value of the cars in 1984. We have accepted respondent's estimate of $ 120,000 salvage value at the end of 1979. A balloon payment of more than $ 222,777 would be due June 1, 1981. We do not believe petitioner would be likely to more the balloon payment in view of the residual *536 value of the cars. Even if he were to do so, however, we note that he would not enjoy one cent of cash flow until well into 1985, by which time the cars would again need major overhaul. Judging from the prior costs of overhaul, we think the rehabilitation costs would exceed the value of the cars. Petitioner offered no evidence on this point. To find a profit potential after 1984, in light of these reasonable assumptions, would require pure speculation. In light of the above, we hold that there was no reasonable possibility of profit aside from tax benefits in this leasing transaction. Business Purpose
Petitioner testified that he entered into the transaction for the purpose of making a profit. However, the objective facts rather than petitioner's self-serving statements are controlling. Thomas v. Commissioner,84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). The facts here show that petitioner failed to examine the transaction from an economic viewpoint, either in 1974 when he produced the documents for Polly or in 1976 when he *537 entered into the instant transaction on his own behalf. Instead, petitioner relied on Polly's representations about his own deal which, despite petitioner's professed belief to the contrary, was substantially different. First, Polly paid $ 6,500 per car (or $ 260,000 for 40 cars), while petitioner paid $ 10,360 each (or $ 414,400 total). Polly believed, based on an appraisal, that he was paying fair market value. However, he also believed the cars he bought were then in interchange condition and could begin generating income immediately. Petitioner, then, paid 37 percent more to obtain what Polly had thought he was already getting for less: cars in interchange condition. In addition, the cars petitioner bought were two years older. Yet petitioner did not obtain an appraisal nor the opinion of anyone other than Polly, the seller. Petitioner might have, but apparently did not, evaluate the effect of OT-37B on profitability. He relied solely on Polly's explanation. At the time Polly entered into the 1974 deal, OT-37B was not in existence and none of Polly's projections took it into account. Polly based his projections on a $ 7,001 -- $ 9,000 ledger value. Although OT-37B *538 increased the ledger value for petitioner's cars, he testified that he considered car hire rate tables meaningless. Further, petitioner never did any economic projections to ascertain the likelihood of paying off the debt, the likely useful life of the cars, or the likely residual value. He testified he thought this was "a forever game." On cross examination petitioner said he relied on Polly's assumption that Polly's cars would be paid off between 5 and 7 years, so petitioner thought his own would also be paid off in the same time. This assumption ignores the fact that petitioner's own debt per car was 37 percent higher than Polly's and that his own balloon payment was due in 5 years compared to Polly's 10. Petitioner is a Harvard-trained attorney who specializes in advising businessmen on the viability of proposed deals. He himself either drew up or reviewed all the documents in both Polly's and his own transactions. [27] We find it incredible that such a person would have treated this transaction in so cavalier a fashion if he had a business purpose other than obtaining tax benefits. *539 Our conclusion is buttressed by the disparity between before-tax profit and tax benefits. While petitioner had no discernible profit potential, the tax benefits were sufficient to wipe out tax on nearly $ 100,000 income per year over a period of 5 years. When petitioner was asked how he expected to make a profit in light of the fact that he would receive no cash until the debt was fully paid, petitioner responded, "That's correct, but I would have had cash from my shelter of my other income as well." In other words, petitioner expected his profit to come from sheltering his other income, not from the transaction itself. Petitioner's motive is further revealed by his subsequent actions. On his return he claimed a 4 year useful life and salvage value of only $ 62,160 or $ 1,554 per car. This conflicts sharply with his testimony that he believed the cars would generate income for 10 years or more after his debt was paid, but it is consistent with a desire to maximize depreciation deductions. We have concluded that this transaction had no reasonable possibility of economic profit and that petitioner had no business purpose for entering this transaction apart from tax avoidance. *540 Therefore, petitioner's boxcar leasing transaction is disregarded for Federal income tax purposes. The Nonrecourse Debt
Alternatively, respondent contends that payment of the conditional sale agreement debt of $ 414,400 was too contingent to be included in petitioner's basis for depreciation and ITC purposes. We agree. A taxpayer may not include in his basis in property a liability that, for any economic reason, does not constitute a "genuine debt," Deegan v. Commissioner,787 F.2d 825, 827 (2d Cir. 1986) (per curiam), since it would be manifestly unfair to permit a taxpayer to enjoy the benefits of deducting as losses an alledged indebtedness for which there had been no economic incentive or expectation of repayment. Estate of Baron v. Commissioner, 798 F.2d (2d Cir. 1986), affg. 83 T.C. 542 (1984). Cases involving this issue typically arise either because the face amount of the alleged indebtedness unreasonably exceeds the fair market value of the underlying collateral, see, e.g., Deegan v. Commissioner, supra;Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984), *541 or because the value of the underlying collateral, when considered in light of all relevant circumstances, was so uncertain or elusive that the purported indebtedness must be considered too contingent to justify the depreciation or deduction of the indebtedness from basis. See, e.g., Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986) (note payable solely out of master recording proceeds); Fox v. Commissioner,80 T.C. 972, 1018-1023 (1983) (note payable solely out of book sale proceeds), and affd. sub nom. Barnard v. Commissioner,713 F.2d 230 (4th Cir. 1983), and affd. without published opinion sub nom. Hook v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984). Petitioner contends that he paid fair market value for the cars and that the debt must therefore be respected. He reasons that Polly's price was based on a third-party appraisal; and since petitioner paid Polly's price plus the costs of rehabilitation, petitioner paid fair market value. We do not agree. First, $ 6,500 may have been *542 fair market value for a 25-year-old rebuilt car (AAR "age" 5 years) in interchange condition. What petitioner bought for $ 10,360 however was a 27-year-old car (AAR "age" 7 years) in interchange condition, at a 37 percent mark-up. Further, petitioner had to pay Polly 12 percent of all income, so that in effect he was buying only an 88 percent interest, not 100 percent as Polly bought. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 93 (4th Cir. 1983). Petitioner did not obtain an independent appraisal, did not negotiate the price, and did not deal at arm's length with Polly. We do not agree that petitioner has met his burden of proving that $ 10,360 per car was fair market value. Furthermore, where petitioner's actual indebtedness arises only from the stream of income generated by the boxcars, payment of the debt is too contingent to be recognized regardless of the fair market value. See Estate of Baron v. Commissioner,798 F.2d 65, 70 (2d Cir. 1986). This transaction is distinguishable from a situation where the acquisition of real estate is involved. There payments on a nonrecourse note are usually fixed in amount, not confined *543 solely to the income produced. Moreover, the value of the underlying property is usually appreciating, not wasting as here. Here, if there were no receipts there was no obligation to pay. Petitioners did not offer evidence that the residual value of the equipment on June 1, 1981, when the balloon payment would be due, would be sufficient to cover the debt. On his return, in fact, petitioner claimed a salvage value lower than the amount of the balloon due under even his own most optimistic estimated payout schedule. [28]
Thus, there was no incentive for petitioner to pay the note out of his other funds in order to preserve valuable property -- an element which the courts have found compelling in other cases involving nonrecourse obligations. See Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Seigel v. Commissioner,78 T.C. 659, 689 (1982). Even if recourse, a note will not be recognized if its payment is unlikely. Waddell v. Commissioner,86 T.C. 848, 902-903 (1986). Under these *544 circumstances, the amount of $ 414,400 represented by the nonrecourse debt may not be included in petitioner's basis for purposes of depreciation and investment tax credit. Petitioner further contends that he should be allowed to deduct interest actually paid on the nonrecourse indebtedness. We note that respondent merely disallowed the net losses claimed by petitioner on the boxcar leasing transaction. In each year petitioner's income exceeded the interest claimed. Therefore, the interest has effectively been allowed. [29] This issue is therefore moot. Section 6621(c)
By amendment to answer respondent raised the issue of the increased interest rate under section 6621(c). That section imposes increased interest on substantial underpayments (greater than $ 1,000) of tax attributable to tax motivated transactions. A tax motivated transaction means any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). *545 Valuation overstatements are defined by section 6659(c) as follows: (c) Valuation overstatement defined. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). Section 6621(c)(3)(B) provides that the Secretary may by regulations specify other types of transactions which will be treated as tax-motivated. Respondent's temporary regulations provide that -- Deductions disallowed under the following provisions are considered to be attributable to tax motivated transactions: (1) Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual * * * that is not engaged in for profit, and (2) Any deduction disallowed for any period under section 165(c)(2), relating to any transaction not entered into for profit. [Sec. 301.6621-2T, A-4, Proced. & Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 369-370, 49 Fed. Reg. 50392 *546 (Dec. 28, 1984).] We have concluded that petitioner's equipment transaction was without business purpose or economic substance and was to be disregarded for Federal tax purposes. Petitioner claimed a basis of $ 414,400 in his equipment. In fact he acquired no basis in that equipment for depreciation or investment tax credit purposes. The adjusted basis claimed on the return, therefore, is 150 percent or more of the correct value. See Zirker v. Commissioner,87 T.C. 970 (1986). Accordingly, petitioner's claimed losses are attributable to tax-motivated transactions within the meaning of section 6621(c), and the increased rate of interest provided by section 6621(c) applies to the disallowed losses. The increased interest rate applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F. 2d 1005 (2d Cir. 1986). Decision will be entered for respondent.
Footnotes
1. Section 6621(d) was redesignated subsection (c) and amended by section 1511(c)(1)(A)-(c), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. The reference to this section herein is as redesignated and amended. Otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue. Unless otherwise indicated, all Rule references are to the Tax Court's Rules of Practice and Procedure. ↩
2. Unless otherwise noted, words used herein such as "investment," "purchase," "lease," "debt," etc. are used solely to describe the form of the transaction, not the substance. ↩
*. These amounts were shown on the return but not claimed, since petitioners showed zero tax liability before applying the credit. ↩
3. Petitioners and respondent disagree on brief as to the source of the disallowed ITC in 1979 and 1980. From our study of the returns, we agree with petitioners that the amounts disallowed in 1979 and 1980 were unrelated to this transaction. However, petitioners did not present any evidence at trial nor make any argument as to why the disallowed credits for 1979 and 1980 should be allowed. We therefore deem petitioners to have waived the issue. ↩
*. Cost - $ 414,400. Salvage Value - $ 62,160 Useful Life - 48 months ↩
4. "Railroad Facts, 1985 Ed.," a publication of the Office of Information and Public Affairs, Association of American Railroads ("AAR"). The parties stipulated to this document as a joint exhibit. ↩
5. Petitioner Gloria Weiss is involved in this case solely by virtue of having filed joint income tax returns with petitioner William L. Weiss ("petitioner"). ↩
6. Before final terms were reached Polly made several prior offers to Chemical. During the transactions at issue, Polly sometimes acted in his own name and sometimes in the name of one of his several companies, only some of which were incorporated. Polly's original offers were in his own name. The conditional sale agreement and promissory note were signed by Polly as president of "Harvey Industries, Inc." ("Industries") ("corporation). "Harvey Enterprises" ("Enterprises") is shown as lessor of the cars. The lessee remitted some fees to "Harvey Associates" ("Associates"). Polly testified, "There was a couple of names that we used, but that was basically me as a private individual making management fees." For convenience, except where noted, we will refer to these entities collectively as "Polly." ↩
7. Polly was familiar with the railroad industry. During the early 1970's Polly was president of Emons Industries, which had acquired a railroad and entered into the boxcar rebuilding and rehabilitation business during his tenure. Polly was no longer with Emons when he learned of the proposed boxcar sale by Chemical. ↩
8. We are not told why Chemical loaned Polly $ 4,319,500 on a $ 4,144,500 sale. We note, however, that the $ 175,000 difference coincides with the amount of sale expenses Polly was required to bear, and we assume it was intended to cover those costs. ↩
9. So stipulated. However, we note that the conditional sale agreement and promissory note are inconsistent regarding payment of the debt. The conditional sale agreement, on pages 3 and 4, agrees with the stipulation. However, the promissory note provides as follows: Notwithstanding any limitations on the obligation of the Vendee to pay the Conditional Sale Indebtedness under the aforesaid Conditional Sale Agreement, the obligations of the Vendee to pay the principal of and interest on this Note shall be unconditional and absolute * * *. The conditional sale agreement is dated "as of" December 15, 1974 (acknowledged and notarized December 31, 1974) and signed by Philip W. Abell, vice president of Chemical Bank and Harvey Polly as president of Harvey Industries, Inc. The related promissory note payable to Chemical Bank is dated December 15, 1974, and signed by Polly on behalf of Harvey Industries, Inc.
Not only are the conditional sale agreement and note contradictory, but the conditional sale agreement is internally inconsistent as well. Despite the language on pages 3-4, Article 15 provides that upon default the bank may seize and sell the boxcars and apply the proceeds to the purchase price, but the vendee remains liable for any deficiency, which is due on demand. The vendor is entitled to recover judgment for the unpaid balance of indebtedness out of any property of the vendee, wherever situated. [Emphasis added.] Further, in addition to giving the bank a security interest in the equipment, Polly was required to pledge 200 shares of his stock in Industries as additional security. Article 19 required Industries to maintain a $ 500,000 life insurance policy payable to Industries on Polly's life or that of his successor as chief executive officer. Thus the conditional sale agreement required assets other than the equipment from which to collect. This also would support an argument that there was recourse or limited recourse liability. Faced with this ambiguity in the controlling documents, however, we accept the parties' stipulated interpretation of their agreement. ↩
10. In his cover letter to Chemical, Polly states, "Without any increases in the rates over the next few years, the principal should be returned in approximately four years." However, the schedule purportedly attached to the cover letter shows a $ 149,523 balance remaining at the end of the seventh year. We have been offered no explanation for the inconsistency between the cover letter and the schedule. ↩
11. Respondent stipulated to the authenticity of the documents containing this information, but not "to the truth of the matters contained therein." However, respondent did not raise any objection at trial nor introduce any contrary evidence on this point. Petitioner's accountant since 1977 also testified that a $ 9,000 ledger value was assigned to Penn Central's cars before their transfer to Polly. Although he did not work for Polly in 1974, we assume he had access to the historical records concerning the transaction. Further, neither Shearson Hammill nor Penn Central would have had any motive to misrepresent this fact. ↩
12. We note that the ICC rate table upon which the mileage rates are based anticipates annual maintenance charges of $ 328 per car. ↩
13. There is no document showing ownership in Harvey Enterprises. The conditional sale agreement was in the name of Harvey Industries. Apparently, this is another example of Polly's casual use of various forms in which to do business, without concern for the legal niceties. See n. 6. ↩
14. Polly became a 20 percent shareholder in LOAM in December 1974 at about the same time the lease was executed. ↩
15. Respondent's witness Craig E. Burroughs, who was president of LOAM in 1974, testified that the percentage retained by LOAM was later reduced from 7 percent to 6 percent by amendment to the lease agreement. We do not know exactly when this occurred. ↩
16. We are not told how much, if any, incentive income was actually earned during the years in issue or how it was used. Petitioner, however, testified that he had not acquired any new cars. ↩
17. "Interchange condition" means that the cars are suitable for use by other railroads. ↩
18. The 164000 and 165000 series boxcars were renumbered as 464000 and 465000 cars. ↩
19. Jena notified LOAM by letter dated February 27, 1976 that Jena's rehabilitation cost was $ 3,244 for labor and materials plus 14 percent workmen's compensation and other health benefits, for a total of $ 3,698.16 per car. The $ 161.84 discrepancy is not explained. ↩
20. Petitioner has not shown costs or other facts to support a finding that the rehabilitated cars properly qualified for the $ 15,001-$ 17,000 cost bracket. His "evidence" consists of conclusory statements by petitioner's expert and accountant Morton Kalb (who had no first-hand knowledge since he was first employed by Polly in 1977). Kalb used the $ 15,001-$ 17,000 category in his expert report. In his testimony, however, he could not re-create the number purportedly filed by Industries with the AAR (Ex. 38-AL) nor did he offer any alternative figures to support the claimed cost bracket. Exhibit 38-AL, on which Kalb may have relied, is titled "OT-37-B Valuation Form." It is signed by R. L. Taylor, Director of Purchasing, LOAM and dated June 28, 1976. It shows a rehabilitation cost of $ 5,355 (not $ 3,860 as the evidence shows), and other unexplained additions. Mr. Taylor was not called as a witness, nor was his absence explained. ↩
21. At one point Polly was asked whether he gave Weiss the projections. He answered, "I don't think so." Later Polly said, "He saw the numbers, he saw what I was paying, he saw what the return was going -- what the projection was." Weiss could not specifically recall seeing the schedule. ↩
22. No document or testimony is in evidence setting forth the terms of such agreement or, in fact, demonstrating that Chemical ever in fact affirmatively approved the arrangement. ↩
23. Prices actually fell from 1975 to 1976. ↩
24. Respondent does not contend otherwise, but opines that the parties must have intended that Industries would get 20 percent after the LOAM lease expired. The record does not support such a finding. See n. 26, infra.↩
25. The only other members of the pool were Polly's mother-in-law and two of his children. ↩
26. Actual written terms of the management agreement say 20%. Petitioner was also subject to the LOAM lease which provided 6% to LOAM. The operative documents could thus be read together to require a total of 26% management fees from petitioner. We accept for purposes of this analysis the testimony of Morton Kalb, petitioner's accountant, that the 12% petitioner actually paid represented 6% to LOAM and 6% to Polly. This assumption is highly favorable to petitioner; but it is also supported by our inference that Chemical would not have approved the sale to petitioner if its own income stream would have been diminished as would be the case if Polly were allowed to retain 20%. ↩
27. The carelessness with which the documents were drafted also indicates petitioner's lack of business purpose. The lessor on the LOAM lease is erroneously shown as "Harvey Enterprises" instead of Harvey Industries; a 20 percent commission figure is listed in the pooling agreement, although the parties testified that 12 percent was intended; and petitioner argues (for the first time in his reply brief) that the disparity between the 10 year term of Polly's debt and petitioner's 5 years term "is obviously attributable to a drafting error" (a proposition the Court does not accept). ↩
28. Petitioner's expert Morton Kalb was also the CPA who provided the return figures. ↩
29. See Dobbs v. Commissioner,T.C. Memo. 1987-361↩.